# Exhibit A

SUPERIOR COURT OF WASHINGTON FOR KING COUNTY

| | |
|---|---|
| LESLIE S. KEAN, M.D., Ph.D., an individual, | No. |
| Plaintiff, | COMPLAINT FOR DAMAGES |
| v. | |
| SEATTLE CHILDREN'S HOSPITAL, a non-profit corporation, d/b/a SEATTLE CHILDREN'S RESEARCH INSTITUTE, | |
| Defendant. | |

COMES NOW Plaintiff, Dr. Leslie S. Kean, by and through her undersigned attorneys, and alleges as follows:

## I. PARTIES

1.      Plaintiff Leslie S. Kean, M.D., Ph.D., is a resident of the County of King, state of Washington.

2.      Defendant Seattle Children's Hospital, doing business as Seattle Children's Research Institute ("SCRI"), is a Washington non-profit corporation with its principal place of business in Washington State.

## II. JURISDICTION AND VENUE

3.      This court has jurisdiction and venue is proper in this Court due to Defendant's location in King County and Plaintiff's contacts with the state of Washington and King County.

COMPLAINT FOR DAMAGES – 1

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

4.      Although Dr. Kean resides only part-time in King County, she maintains her primary residence in Seattle, files taxes in Washington State, and has a Washington driver's license.

5.      Dr. Kean was employed by Seattle Children's Research Institute from 2013 through 2018. Dr. Kean's injuries in this lawsuit arise out of SCRI's contracts and associations with Dr. Kean in Seattle.

## III. FACTS

6.      SCRI has an Intellectual Property Policy that applies to "[a]ll staff, faculty members, visiting or adjunct faculty (regardless of such person's obligations to other institutions), students, and any other individuals (whether paid or unpaid) associated with SCRI." Ex. A (the "Policy").

7.      The Policy defines intellectual property as:

> Ownership and associated rights relating to scientific discoveries, technological advances, compilations, and original works. Intellectual Property **includes** Patents, Trademarks, Copyrights, Trade Secrets **and other species** such as computer software, Mask Work, printed material, or **Tangible Property**. . . . Intellectual Property is created when **something new and valuable has been conceived or developed**, or when unusual, unexpected, or non-obvious results have been discovered with existing technology and which can be **applied to some useful purpose**.

Ex. A at 1–2 (emphasis added).

8.      The Policy provides that "net revenue" derived from the licensing of intellectual property will be distributed as follows:

| Net Revenue | Inventors, Creators, Authors | Inventor's/ Creator's/ Author's Department | SCRI Royalty Funds |
|---|---|---|---|
|  | 1/3 | 1/3 | 1/3 |

COMPLAINT FOR DAMAGES – 2

The Policy defines net revenue as the total gross revenue of licensing agreements, less a 20% administrative fee and direct costs incurred by SCRI. Ex. A at 6–7.

9.      Dr. Kean is a nationally- and internationally-recognized expert on the impact of co-stimulation blockade agents on Graft vs. Host Disease ("GvHD"). GvHD is a disease that is characterized by inflammation in different organs, and is often observed in patients receiving bone marrow transplants. GvHD may occur when the white blood cells of the donated tissue attack the recipient's tissues and organs. There are no approved therapies for the prevention of acute GvHD.

10.     Co-stimulation blockade agents are drugs that are generally used to treat autoimmune diseases such as rheumatoid arthritis. This class of drugs includes the drug abatacept, which goes under the brand name ORENCIA.

11.     Over the last decade, Dr. Kean has led the preclinical, phase I, and phase II trials of abatacept treatment of GvHD.

12.     To run the phase II clinical trial of abatacept, known as the "ABA2," Dr. Kean filed an Investigational New Drug ("IND") application with the Food and Drug Administration ("FDA"). An IND is submitted to the FDA if a drug is intended to be used for the purposes of a clinical investigation. Dr. Kean was and continues to be the sole holder of the IND.

13.     Dr. Kean joined SCRI in 2013 from Emory University. The ABA2 trial had begun prior to her joining SCRI. Dr. Kean led the clinical trial and biology studies while at SCRI. The trial completed patient accrual prior to Dr. Kean leaving SCRI. Dr. Kean continues to lead the long-term follow-up of patients and the biology studies from Boston Children's Hospital, where she now works.

14.     The results of the ABA2 trial are extremely promising. Among other markers of success, Bristol-Myers Squibb Co. ("BMS") became interested in licensing intellectual property controlled by SCRI in order to support commercialization and FDA filings for ABA2, including

COMPLAINT FOR DAMAGES – 3

filing for FDA approval for a new indication for abatacept to treat GvHD. This licensing agreement was initiated after the trial was completed and the results were publicly disclosed.

15. Abatacept is approved by the FDA to treat adult rheumatoid arthritis, juvenile idiopathic arthritis, and adult psoriatic arthritis. To obtain FDA approval for a new indication, BMS needed to obtain, at minimum, biological samples and clinical data collected during the ABA2 trial. These biological samples and data were, in part, collected by Dr. Kean before she joined SCRI and were continued to be collected after Dr. Kean left SCRI.

16. The results of Dr. Kean's clinical trial have led to the FDA granting abatacept a Breakthrough Therapy Designation for the prevention of acute GvHD after transplantation. This is the first time that a drug has been given a Breakthrough Therapy Designation for GvHD Prevention. This designation was solely based on Dr. Kean's preclinical and clinical trials.

17. SCRI sought to enter a license with BMS that would grant BMS the right to use biological samples and clinical data from Dr. Kean's research in the ABA2 trial (the "License").

18. Brian Phillips, the Director of Intellectual Property Core for SCRI, asked for and received assistance from Dr. Kean when negotiating the license terms with BMS. As part of this assistance, Mr. Phillips informed Dr. Kean of the Policy.

19. As Mr. Phillips explained to Dr. Kean, the Policy includes a distribution of 33% of net revenue to inventors, creators, and authors of intellectual property.

20. After informing Dr. Kean of the Policy, Mr. Phillips worked with Dr. Kean to negotiate the BMS license in order to maximize monetary value for both SCRI and Dr. Kean. The License provides for gross revenue of up to $6,480,000 if all performance-based milestones are achieved. The original proposed agreement with BMS included licensing three items: (1) a 'method of use' patent; (2) the transfer of samples that Dr. Kean created during the trial; and (3)

COMPLAINT FOR DAMAGES – 4

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

licensing of the data generated from the trial. The creation of the samples required expert fractionation of blood and critical linkage to trial data that only Dr. Kean possessed.

21.     Importantly, the trial data was not stored at SCRI, but rather, was stored on a web-based database, using both Emory University and the University of Washington's Institute for Translational Health Sciences' (ITHS) software. After BMS decided to license two of the three items (the samples created during the trial and the data generated from the trial, but not the 'method of use' patent), Dr. Kean asked Mr. Phillips about the disposition of funds for items (2) and (3), and Mr. Phillips did not indicate any change to the previously agreed-upon payment structure.

22.     It was understood by all parties involved in the license negotiation—including Dr. Kean and Mr. Phillips—that the Policy would apply to the License revenues.

23.     The final license agreement between SCRI and BMS acknowledges Dr. Kean as the person responsible for developing the **intellectual property** being licensed:

WHEREAS, SCH owns certain intellectual property developed by Dr. Leslie Kean relating the Subject Matter, including certain applications for United States letters patent relating to such intellectual property, as well as certain data and material samples arising out of the Sponsored Research Agreement (the "*Study Results and Materials*"); and

. . .

WHEREAS, Company now desires to obtain a license to certain intellectual property controlled by SCH that directly relates to or covers the SCH Tangible Materials or SCH Technical Information (as such terms are defined below), in order to further support commercialization of the product known as ORENCIA® (abatacept), in accordance with the terms and conditions set forth herein.

24.     The License defines the "intellectual property" subject to licensing as follows:

"*SCH Tangible Materials*" means those aliquots of tangible materials Controlled by SCH that have been delivered to Company pursuant to the MTA, as set forth in Exhibit A, and any progeny or derivatives of such tangible materials developed by Company, its Affiliates and sublicensees.

"*SCH Technical Information*" means that data developed at SCH under the supervision of Dr. Leslie Kean that is directly related to the SCH Tangible Materials and that is Controlled by SCH and that has been delivered to Company as set forth in Exhibit B.

COMPLAINT FOR DAMAGES – 5

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

25.     Eight months after concluding enrollment on the ABA2 trial, Dr. Kean left SCRI and joined Boston Children's Hospital. BMS also entered into a similar license agreement with Boston Children's Hospital in order to secure the right to access data and samples for future FDA submissions.

26.     In 2018, SCRI transferred research samples to BMS, thereby triggering payment to SCRI under the license. The clinical samples were necessary for BMS to conduct its analysis and make regulatory filings.

27.     Based on the clinical samples and data developed by Dr. Kean and subject to the License, the FDA has granted "Breakthrough Therapy Designation" for abatacept. Breakthrough Therapy Designation is an FDA program intended to expedite the development and review of medicines for serious or life-threatening diseases with preliminary clinical evidence that the investigational therapy may offer substantial improvement on at least one clinically-significant endpoint over available therapy.

28.     In January 2019, in anticipation of SCRI receiving license revenue under the agreement as a result of the transfer, Dr. Kean asked Mr. Phillips about the revenue distribution under the SCRI Policy. At that time—and contrary to his previous representations to Dr. Kean—Mr. Phillips informed Dr. Kean that the Policy did not apply to the BMS license and that SCRI would not be sharing revenue with Dr. Kean.

29.     Dr. Kean appealed this decision on September 15, 2019 to SCRI. On October 15, 2019, SCRI again refused to apply the Policy to the license, in direct contravention of the Policy.

30.     On December 2, 2019, Dr. Kean requested an opportunity to be heard by the Intellectual Property Management Group ("IPMG"). On March 4, 2020, SCRI informed Dr. Kean that it "ha[d] begun the process of reconvening the IPMG" per Dr. Kean's request.

COMPLAINT FOR DAMAGES – 6

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

31.     Over six months later, on September 11, 2020, Dr. Kean received a one-page letter stating the IPMG refused to apply the Policy to the license.

32.     In contrast, Boston Children's Hospital has received revenue under its substantially-identical license with BMS, and has distributed a portion of that revenue to Dr. Kean under the Boston Children's Intellectual Property Policy.

33.     Indeed, on June 18, 2020, Boston Children's Hospital approved payment of royalties to Dr. Kean under its substantially-identical data license with BMS. The letter also permitted Dr. Kean to begin receiving royalties immediately, even though the study is ongoing and has not yet been published.[1]

34.     By refusing to pay the revenues to Dr. Kean that she is owed under the Policy, SCRI breached the Policy and has been unjustly enriched, causing injury to Dr. Kean.

### FIRST CAUSE OF ACTION:

### BREACH OF CONTRACT

35.     Dr. Kean incorporates all previous allegations.

36.     SCRI's Policy, which distributes revenue to the developers of intellectual property at SCRI, is an enforceable contract that it entered into with Dr. Kean.

37.     The clinical samples and data are intellectual property under the Policy.

38.     SCRI has breached the Policy by failing to distribute revenue to Dr. Kean to which she is entitled to under the Policy for the licensing of clinical samples and data.

39.     SCRI's breach has caused Dr. Kean damages for which she is entitled to recover, and Dr. Kean is entitled to receive 33% of the net revenue under the License.

---

[1] The main manuscript describing the results of the trial was in final revisions as of August 2020 and is set to be published shortly.

COMPLAINT FOR DAMAGES – 7

**CORR CRONIN LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

## SECOND CAUSE OF ACTION:

## UNJUST ENRICHMENT

40.     Dr. Kean incorporates all previous allegations.

41.     The clinical data and samples are valuable materials created by Dr. Kean and that have generated licensing revenue for SCRI. The creation of the clinical data began before Dr. Kean arrived at SCRI and has continued since she left SCRI.

42.     SCRI has refused to apply its own Policy to Dr. Kean such that it has refused to distribute revenue to Dr. Kean to which she is entitled.

43.     By arbitrarily and unfairly refusing to apply its Policy to Dr. Kean, SCRI has unjustly enriched itself.

44.     Dr. Kean is entitled to the reasonable value of this improper enrichment in an amount to be proven at trial.

## THIRD CAUSE OF ACTION:

## EQUITABLE ESTOPPEL

45.     Dr. Kean incorporates all previous allegations.

46.     Mr. Phillips indicated to Dr. Kean, through words and actions, that the Policy would apply to the License and that Dr. Kean would be entitled to a share of License revenue.

47.     Dr. Kean reasonably relied upon Mr. Phillips's representations when assisting SCRI during negotiation of the License and afterwards.

48.     SCRI has refused to distribute revenue under the Policy to Dr. Kean, causing her damages.

49.     SCRI should be equitably estopped from refusing to distribute revenue to Dr. Kean.

COMPLAINT FOR DAMAGES – 8

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff now prays for judgment against Defendant as follows:

A.      That Dr. Kean be awarded a judgment in her favor for each of the Causes of Action set forth in this Complaint;

B.      For injunctive relief to enforce the Policy and estop SCRI from refusing to distribute net revenue from the license to Dr. Kean;

C.      For actual damages and/or unjust enrichment for breach of contract;

D.      For attorney fees and costs as the prevailing party;

E.      For prejudgment interest on all amounts awarded; and

F.      For any and all further relief that this Court deems just and equitable.

DATED this 3rd day of November, 2020.

CORR CRONIN LLP


*s/ Eric A. Lindberg*
Eric Lindberg, WSBA No. 43596
Maia R. Robbins, WSBA No. 54451
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600 phone
Email: eharris@corrcronin.com
       elindberg@corrcronin.com
       mrobbins@corrcronin.com

*Attorneys for Plaintiff*

COMPLAINT FOR DAMAGES – 9



**EXHIBIT A**


| | | |
|---|---|---|
| **TITLE** | Intellectual Property Policy | ☒ FINAL |
| **NUMBER** | IPC-100 | ☐ DRAFT |
| **EFFECTIVE** | 1/1/2012 | ☐ RESCINDED |
| **REVIEWED** | | |

## POLICY

### Purpose of Policy, Philosophy & Objectives

The prompt and open dissemination of the results of research and creative work among scholars and, eventually, to the public at large is essential to Seattle Children's Research Institute's mission. The commercial development and distribution of the results of research and creative work to benefit the inventor or creator, health, and the economy is part of the Institute's purpose. This Policy is intended to facilitate the commercial development of Intellectual Property arising at the Institute and to provide an incentive to Institute inventors or creators to participate in such development. The Institute is interested in advancing the practical applications of research findings to encourage the development of Intellectual Property for the best interest of the public, the creator(s), the research sponsor (if any), and the Institute. The Institute is especially interested in advancing the improvement of health conditions in general and child health in particular. Effective dissemination and commercialization of technology may require protection and licensing of SCRI Intellectual Property.

### Scope

This policy covers Intellectual Property, both patented and non-patented innovations, including computer software with commercial value, and is applicable to all faculty, staff, and students conducting work at or on behalf of Seattle Children's Research Institute or Seattle Children's. The policy does not cover scholarly works.

The Intellectual Property Core (IPC) is the SCRI Department that is responsible for all technology transfer and related intellectual property matters. The IPC works in coordination with the President, Research Institute, the Office of the General Counsel, and the Intellectual Property Management Group.

### Definitions and Roles

Covered Individuals - All staff, faculty members, visiting or adjunct faculty (regardless of such person's obligations to other institutions), students, and any other individuals (whether paid or unpaid) associated with SCRI.

"Special Case Contributor" means a Contributor that has University faculty (including those who are members of Children's University Medical Group (CUMG)), staff, trainee, or student status, whose financial support was provided by Children's (even if administered through University), and who, for activities leading to generation of the IP, (i) did not have University funded salary support; (ii) did not utilize facilities of the University; and (iii) did not utilize extramural funds administered by the University or intramural funds provided by University.

Intellectual Property – Ownership and associated rights relating to scientific discoveries, technological advances, compilations, and original works. Intellectual Property includes Patents, Trademarks, Copyrights, Trade Secrets and other species such as computer software, Mask Work, printed material, or Tangible Property. The formal protections provided by Patents,

Copyrights or Trademarks may be used to preserve some Intellectual Property from unauthorized use or misappropriation. Intellectual Property is created when something new and valuable has been conceived or developed, or when unusual, unexpected, or non-obvious results have been discovered with existing technology and which can be applied to some useful purpose. Intellectual Property can be created by one person or co-created by several.

Vice President, Research directs the Intellectual Property Core (IPC) and is responsible for the overall implementation of this policy.

President, Research Institute oversees the activity of the IPC and implementation of this policy; serves as decision maker in matters of resource allocation, investment, interpretation of and exceptions to policy and in dispute matters under this policy.

General Counsel chairs the Intellectual Property Management Group; advises the IPC and President, Research Institute in matters of intellectual property law, commercialization, conflicts of interest, and risk management and related matters; directs and effects the selection of patent attorney and other legal resources in support of IPC objectives.

Intellectual Property Management Group advises the IPC on Intellectual Property Matters; hears and makes recommendations to the President, Research Institute in matters of dispute under this policy; advises on licensing and prosecution matters. Through its chair, the IPMG will report quarterly or as required to the Seattle Children's Research Institute Advisory Board of the Board of Trustees regarding the current status of Seattle Children's research-related intellectual property.

1. **Reporting**
   a. **Reporting: Reporting Obligation**

      All Intellectual Property, as defined, including potential inventions, should be reported promptly by the inventor to the IPC. Faculty and staff should contact The IPC for advice on administrative matters, including how to report a potential invention and how to assess special requirements of sponsoring agencies. Potential inventions should be reported on an Invention Disclosure (forms available from the IPC). The Invention Disclosure serves as the basis for any patentability assessments and the crafting of any patent application. It is also essential to support the commercial and technical assessment of the potential invention. Disclosures should be submitted to the IPC.

   b. **Reporting: Supporting Materials**

      Supporting materials including lab notebooks, data sets, and publication drafts are often helpful in preparing invention disclosure and may be helpful in establishing when an invention was actually made.

2. **Assignment**
   a. **Assignment Obligations & Ownership**

      The ownership of Intellectual Property developed by Covered Individuals, using SCRI-administered facilities, funding, or resources (including but not limited to: use of equipment, laboratory space, funds administered by SCRI including funds from sponsored research or gifts, etc.) vests in SCRI.

**b. Assignment Obligations & Ownership: By Use of Facilities, Funding, and Resources administered by SCRI**

By virtue of using facilities, funding, or resources administered by SCRI, and even if a specific assignment agreement is not signed, Covered Individuals assign all inventions in which SCRI has an interest to SCRI. Covered Individuals shall execute documents of assignment and do everything reasonably required to assist SCRI in obtaining, protecting, and maintaining patent or other proprietary rights.

**c. Assignment Obligations & Ownership: Confirmed in writing**

For purposes of clarity, the IPC will collect disclosure-specific assignment documents from Covered Individuals. Refusal to sign such assignment documents does not negate assignment given as provided for above and may be grounds for the suspension or termination of the Covered Individual's use of facilities, funding, or resources administered by SCRI.

**d. Assignment Obligations & Ownership: Subject to Contractual Obligations**

In the case of Inventions developed in the course of research funded by a sponsor pursuant to a grant or research agreement, or which is subject to a materials transfer agreement, confidential disclosure agreement or other legal obligation requiring disclosure, the disclosure, management, and assignment/ownership of such Intellectual Property will be managed consistent with the terms of such grant or agreement, as approved by SCRI, if such terms differ from this Policy.

**e. Assignment Obligations & Ownership: Agreement with UW**

The University of Washington (UW) and SCRI have a unique, valuable, and collaborative relationship related to pediatric-focused research that involves frequent collaborations between researchers from both institutions. Because such collaborations sometimes result in Intellectual Property in which both UW and SCRI have an interest, they have entered into an agreement (Inter-Institutional Agreement on Intellectual Property Management between The University of Washington and Seattle Children's Hospital dba Seattle Children's Research Institute, 7/3/2012) with respect to their rights in and management of Intellectual Property. In addition to agreeing to certain collaborations pertaining to shared intellectual property, the UW and SCRI agreed to their respective rights with respect to the special case of Intellectual Property created by individuals who have the status of University faculty, trainee, or student, and are engaged in research or clinical practice in Children's facilities or utilizing or being supported by funding from or administered by Children's. Because of their connections to both University and Children's, such individuals may be subject to certain policies and procedures of both institutions, including the two institutions' respective intellectual property policies. The UW and SCRI agreed that where a Special Case Invention involves only inventors who are Special Case Contributors, Children's will be the Lead Party, meaning that SCRI IPC will manage the intellectual property and Special Case Contributors assign the intellectual property to SCRI.

**f. Assignment Obligations & Ownership: Commissioned Works and Work-for-Hire**

SCRI will own any Intellectual Property that is made, discovered, or created by a Covered Individual who is specifically hired or commissioned by SCRI for that purpose, unless otherwise provided by written agreement between such individual and SCRI. Unless provided for otherwise in the written agreement, the creator of the Intellectual Property generated as a Commissioned Work or work-for-hire shall not be entitled to participation in revenue distributions. The written agreement must be entered into prior to initiation of work that will lead to the commissioned work or work-for-hire.

3. **Evaluation**

The IPC will review, evaluate, and make a disposition of all disclosure forms, and will promptly notify the Covered Individual of the disposition. The evaluation and disposition of a disclosure will be completed as soon as possible after the IPC receives a complete and accurate Invention Disclosure form and any other information that the IPC requests in order to make an informed evaluation of a potential invention. In the case of Intellectual Property that the Covered Individual discloses for possible commercialization by SCRI, the IPC will evaluate its commercial potential and the likelihood of the intellectual property being protectable. To assist in this determination, the IPC may consult with patent or copyright counsel and outside experts and may seek the advice of the Intellectual Property Management Group. Once the evaluation is completed, the IPC will develop and pursue a plan for the intellectual property, which may include protection through patent prosecution.

4. **Prosecution**

If the IPC elects to pursue protection through patent prosecution, the IPC will arrange resources (including consultants, patent attorneys, prospective licensees, etc) that are necessary to prepare the patent application(s). The patent applications will be submitted by patent attorneys/agents designated by the IPC.

a. **Prosecution: Participation Expectations**

Crafting a high quality patent application depends on the contribution of a number of actors, especially the inventors. Therefore, the inventors should expect to actively collaborate with other resources (including consultants and patent attorneys) in the crafting of the application, as well as in formulating responses to "Office Actions" that will be received from various patent offices and executing formal documents, including assignment documents and declarations.

b. **Prosecution: Decision**

When the IPC has determined that protection of intellectual property is likely to help commercialize the IP and is otherwise a positive value proposition, it will seek protection. Reaching a positive value proposition is not necessarily limited to monetary considerations. In some cases, protection of intellectual property may be pursued even if commercial potential is unclear, to preserve commercial and other opportunities in the future, or when required by an outside sponsor. In general, the IPC will pursue protection for IP that presents a positive value proposition, which may limit the investment that is made in the process of prosecution.

5. **Relinquishment**

   Under certain circumstances, if SCRI elects to not pursue intellectual property protection, SCRI may relinquish its ownership rights in an Invention to the inventor or creator of the Intellectual Property at his or her request. The rights may be governed by legal or contractual obligations which may limit the extent to which SCRI may relinquish its interests. In such cases, the relinquishment of any SCRI rights in the Intellectual Property will be governed by the terms of the relevant grant or research agreement or other contractual obligation. If certain Intellectual Property is available for relinquishment by SCRI, the inventor or creator of the Intellectual Property may request in writing that the IPC grant a release or assignment of rights. The IPC, in consultation with the SCRI President, will promptly respond to this request. SCRI will retain a royalty-free, non-exclusive license to use any such Inventions for academic research and teaching and may retain other rights. If SCRI has incurred expenses in connection with the Intellectual Property (e.g., patent-related expenses), SCRI may condition its relinquishment of rights to that Intellectual Property through a contract with the Covered Individual to reimburse SCRI for those expenses. Once an Intellectual Property is relinquished to the inventor, the inventor may no longer utilize SCRI resources for ongoing research and development related to the intellectual property. An Inventor should consult with counsel of the Inventor's choosing regarding the tax treatment of any relinquished Intellectual Property.

6. **Appeals**

   If an inventor disagrees with an IPC decision or an IPC interpretation of this policy, inventor must first make this known to the IPC. Any disputed issues that cannot be resolved with the assistance of the IPC shall be referred to the Intellectual Property Management Group (IPMG) for a recommendation. Inventor disputing IPC decisions shall request opportunity to be heard by IPMG through the Office of the General Counsel, who will manage the IPMG process, resulting in the IPMG recommendation. The President, Research Institute will receive IPMG's recommendations and will instruct actions, if any. The President, Research Institute is the final arbiter of any disputed issues related to intellectual property, income distribution or the interpretation of this Policy.

7. **Commercialization**

   The IPC as directed by the Vice President, Research, in coordination with the President, Research Institute and General Counsel, has responsibility for the commercial development and administration of all SCRI-owned Intellectual Property.

   a. **Commercialization: Licensing**

      The commercial development of SCRI intellectual property will ordinarily occur through licensing. The IPC will consult with creator(s) of the Intellectual Property in developing a commercialization strategy and identifying potential licensees. The IPC shall promote commercialization through licensing that promotes the dissemination and use of the technology and provides for equitable economic rewards to SCRI.

8. **Revenue Management and Distribution**
   a. **Revenue Management and Distribution: Direct Cost Recovery, Net Revenue Definition**

      Direct costs incurred by SCRI in the protection and licensing of intellectual property


must be recovered before distribution of income begins. The IPC may also retain amounts necessary to recover reasonably anticipated direct costs.

Direct costs include legal expenses and fees incurred by SCRI and associated with obtaining and maintaining patent or other legal protection for Intellectual Property or expenses incurred in support of negotiating, managing, and enforcing assignments, waivers, licenses, and other contracts associated with acquiring, maintaining, and transferring Intellectual Property.

Direct costs also include the SCRI out-of-pocket expenses associated with the promotion of a specific Intellectual Property which includes, but is not limited to, travel, market research, and costs associated with the management and realization of revenue.

Direct costs further include any SCRI investments made in the development of specific technologies. In certain cases these expenditures may be treated as direct costs and may be reimbursed. All such reimbursements shall be subject to approval from the IPC. They will be made only after recovery of the IPC administrative fee and recovery of any other direct costs incurred or reasonably anticipated. If the investments were made by an area other than IPC, the expenditures and reimbursements will be governed by a memorandum of understanding between the IPC and the area. The reimbursement agreement shall be subject to the following restrictions: (1) Expenditures made by units prior to disclosure to the IPC will not be considered; (2) No reimbursements may be made for salaries for individuals hired prior to the disclosure; and (3) Post-disclosure expenditures (usually for prototype development or software development costs) up to $100,000 may be reimbursed from licensing income only when all those who are eligible for a share of the licensing income, including inventors, give written approval. This approval must be in place in advance of any expenditure.

Total Gross Revenue is the total consideration received by SCRI pursuant to a contract pertaining to particular Intellectual Property. Licensee-paid cost recoveries are direct costs incurred by SCRI and paid by a licensee. Adjusted Gross Revenue is the Total Gross Revenue less licensee-paid cost recoveries.

The IPC shall retain licensee-paid cost recoveries, and shall deduct an Administrative Fee of 20 percent from Adjusted Gross Revenue. From the remainder, the IPC shall deduct amounts necessary to cover incurred and reasonably anticipated direct costs. The residual after these deductions from Total Gross Revenue is Net Revenue.

|        |                              |
|--------|------------------------------|
|        | Total Gross Revenue          |
| Less   | Licensee-paid cost recoveries |
| Equals | Adjusted Gross Revenue       |
| Less   | IPC Administrative Fee (20%) |
| Less   | Direct Costs Incurred        |
| Less   | Direct Costs Anticipated     |
| Less   | Direct Cost Investments      |
| Equals | Net Revenue                  |

**b. Revenue Management and Distribution: Generally**

Net Revenue derived from the licensing of intellectual property in which SCRI holds an interest will be distributed as shown in the table below.


| Net Revenue | Inventors, Creators, Authors | Inventor's/ Creator's/ Author's Department | SCRI Royalty Funds |
|---|---|---|---|
| | 1/3 | 1/3 | 1/3 |

This revenue distribution schedule will be used to distribute revenue received by SCRI on technologies licensed on or after January 1, 2012.

**c. Revenue Management and Distribution: Special Case Inventors**

In circumstances where inventors are Special Case Inventors, SCRI will transfer to University of Washington Center for Commercialization 5% of Adjusted Gross Revenue as UWC4C administrative fee and IPC Administrative Fee will be 15% of Adjusted Gross Revenue. Further, the "Inventor's/ Creator's/ Author's Department" share of Net Revenue will be transferred to the University of Washington for distribution to the Inventor'(s) school or college department (75%) and the Inventor's school or college (25%).

There may be circumstances where there are Special Case Inventors and inventors/creators who are not Special Case Inventors. In those cases, distributions and allocations will be adjusted to reflect the inventive or creative circumstances.

**d. Revenue Management and Distribution: If more than one inventor**

In the case of joint inventorship, each inventor's share shall be equal, unless otherwise agree to by each inventor. In such an event, the inventors should document an unequal share agreement and submit that document to the IPC. The unequal share distribution will apply to distributions made after receipt of the unequal share agreement documentation.

**e. Revenue Management and Distribution: Waiver**

An individual entitled to Net Revenue Distribution under this policy may prospectively waive the receipt of a portion or all of his or her distribution. The following conditions apply:

    i. The individual, at the time of the waiver, may designate his or her laboratory or research program, department, or other SCRI area as the recipient of the waived amount. The waived funds will be regarded as regular SCRI funds subject to all of the usual and customary legal and administrative requirements of SCRI, including F&A Assessment, as appropriate.

    ii. In order to ensure that the use of the funds is consistent with the mission of SCRI, the President, Research Institute must approve a plan for the designation of funds submitted by the individual, and, thereafter, may review the use of the funds at any time. It is expected that the waiver plan will be approved only with the concurrence of the Director of the receiving unit, generally the Center Director of the individual's SCRI Research Center.

    iii. The waiver must be irrevocable and executed prior to the end of the fiscal year in which the revenue was generated.

    iv. Funds directed to the individual's research laboratory or program may only be used to support research and educational expenses associated with the

individual's research laboratory or program. Such funds cannot be used for travel (including transportation, lodging, meals, and attendant costs), salary for the individual or a family member, or other similar purpose.

At the discretion of the President, Research Institute, the funds waived by the employee may be matched by SCRI, subject to the following conditions:

v. The match will be on a 1:1 dollar basis.

vi. The Inventor's/ Creator's/ Author's Department participates in the match in an amount equal to the SCRI match.

vii. The combined match from SCRI and Department shall not exceed $100,000 per individual per year, regardless of how many inventions or other intellectual properties are involved. It shall not exceed $300,000 per year from a single license.

### f. Revenue Management and Distribution: COI

The possibility of a financial conflict of interest is inherent in the commercial development of intellectual property. SCRI has, under the management of the Office of Research Compliance (ORC), adopted Conflict of Interest (COI) Policies applicable to all faculty and staff and has established procedures to develop and implement mechanisms to manage, reduce, or eliminate, when necessary, such financial conflicts for individuals engaged in research. These policies require timely disclosure of interests. Special consideration must be given to licensing agreements that could be related to an individual's research.

Conflict of interest management provisions may limit or even preclude inventors' involvement in research that is directed at validation, improvement, or promotion of intellectual property in which they have an interest. For example, intellectual property financial interest concurrent with active participation in clinical trials is likely to present risks so high as to preclude participation of a conflicted individual in clinical trials.

It is important to note that SCRI may also have institutional conflicts of interest, which must be evaluated by the Office of Research Compliance (ORC) and other responsible parties. Such conflicts are handled on an ad hoc basis.

### 9. Sponsored Research Agreements

SCRI may also refuse to process any sponsored research agreement involving Covered Individual to the extent that the agreement would grant rights in Intellectual Property to an outside party in a manner inconsistent with this policy or SCRI's interests.

### APPROVED BY

Erik M. Lausund
Vice President
Research Institute Administration

**IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON**
**FOR THE COUNTY OF KING**

| | |
|---|---|
| Ph.D. Leslie S. Kean, M.D. | NO. 20-2-16194-2  SEA |
| Plaintiff(s) | ORDER SETTING CIVIL CASE SCHEDULE |
| vs | ASSIGNED JUDGE: PARISIEN, Dept. 42 |
| SEATTLE CHILDREN'S HOSPITAL | FILED DATE: 11/03/2020 |
| Defendant(s) | TRIAL DATE:11/01/2021 |

A civil case has been filed in the King County Superior Court and will be managed by the Case Schedule on Page 3 as ordered by the King County Superior Court Presiding Judge.

## I.  NOTICES

**NOTICE TO PLAINTIFF:** The Plaintiff may serve a copy of this **Order Setting Case Schedule (*Schedule*)** on the Defendant(s) along with the ***Summons and Complaint/Petition.***  Otherwise, the Plaintiff shall serve the *Schedule* on the Defendant(s) within 10 days after the later of: (1) the filing of the ***Summons and Complaint/Petition*** or (2) service of the Defendant's first response to the ***Complaint/Petition***, whether that response is a ***Notice of Appearance***, a response, or a Civil Rule 12 (CR 12) motion.  The ***Schedule*** may be served by regular mail, with proof of mailing to be filed promptly in the form required by Civil Rule 5 (CR 5).

**NOTICE TO ALL PARTIES:**
All attorneys and parties should make themselves familiar with the King County Local Rules [*KCLCR*] -- especially those referred to in this ***Schedule***. In order to comply with the ***Schedule***, it will be necessary for attorneys and parties to pursue their cases vigorously from the day the case is filed. For example, discovery must be undertaken promptly in order to comply with the deadlines for joining additional parties, claims, and defenses, for disclosing possible witnesses [*See KCLCR 26*], and for meeting the discovery cutoff date [*See KCLCR 37(g)*].
        **You are required to give a copy of these documents to all parties in this case.**

**CROSSCLAIMS, COUNTERCLAIMS AND THIRD PARTY COMPLAINTS:**
A filing fee of **$240** must be paid when any answer that includes additional claims is filed in an existing case.

**KCLCR 4.2(a)(2)**
A Confirmation of Joinder, Claims and Defenses or a Statement of Arbitrability must be filed by the deadline in the schedule. The court will review the confirmation of joinder document to determine if a hearing is required. If a Show Cause order is issued, all parties cited in the order must appear before their Chief Civil Judge.

**PENDING DUE DATES CANCELED BY FILING PAPERS THAT RESOLVE THE CASE:**
When a final decree, judgment, or order of dismissal of all parties and claims is filed with the Superior Court Clerk's Office, and a courtesy copy delivered to the assigned judge, all pending due dates in this *Schedule* are automatically canceled, including the scheduled Trial Date. It is the responsibility of the parties to 1) file such dispositive documents within 45 days of the resolution of the case, and 2) strike any pending motions by notifying the bailiff to the assigned judge.

Parties may also authorize the Superior Court to strike all pending due dates and the Trial Date by filing a *Notice of Settlement* pursuant to KCLCR 41, and forwarding a courtesy copy to the assigned judge. If a final decree, judgment or order of dismissal of all parties and claims is not filed by 45 days after a *Notice of Settlement*, the case may be dismissed with notice.

**If you miss your scheduled Trial Date**, the Superior Court Clerk is authorized by KCLCR 41(b)(2)(A) to present an *Order of Dismissal*, without notice, for failure to appear at the scheduled Trial Date.

**NOTICES OF APPEARANCE OR WITHDRAWAL AND ADDRESS CHANGES:**
*All parties to this action must keep the court informed of their addresses.* When a Notice of Appearance/Withdrawal or Notice of Change of Address is filed with the Superior Court Clerk's Office, parties must provide the assigned judge with a courtesy copy.

**ARBITRATION FILING AND TRIAL DE NOVO POST ARBITRATION FEE:**
A Statement of Arbitrability must be filed by the deadline on the schedule **if the case is subject to mandatory arbitration** and service of the original complaint and all answers to claims, counterclaims and cross-claims have been filed. If mandatory arbitration is required after the deadline, parties must obtain an order from the assigned judge transferring the case to arbitration. **Any party filing a Statement must pay a $250 arbitration fee**. If a party seeks a trial de novo when an arbitration award is appealed, a fee of $400 and the request for trial de novo must be filed with the Clerk's Office Cashiers.

**NOTICE OF NON-COMPLIANCE FEES:**
**All** parties will be assessed a fee authorized by King County Code 4A.630.020 whenever the Superior Court Clerk must send notice of non-compliance of schedule requirements and/or Local Civil Rule 41.

**King County Local Rules are available for viewing at www.kingcounty.gov/courts/clerk.**

## II. CASE SCHEDULE

| * | CASE EVENT | EVENT DATE |
|---|------------|------------|
|   | Case Filed and Schedule Issued. | 11/03/2020 |
| * | Last Day for Filing Statement of Arbitrability without a Showing of Good Cause for Late Filing [*See KCLMAR 2.1(a) and Notices on Page 2*].<br>**$220 arbitration fee must be paid** | 04/13/2021 |
| * | **DEADLINE** to file Confirmation of Joinder if not subject to Arbitration [*See KCLCR 4.2(a) and Notices on Page 2*]. | 04/13/2021 |
|   | **DEADLINE** for Hearing Motions to Change Case Assignment Area [*KCLCR 82(e)*]. | 04/27/2021 |
|   | **DEADLINE** for Disclosure of Possible Primary Witnesses [*See KCLCR 26(k)*]. | 06/01/2021 |
|   | **DEADLINE** for Disclosure of Possible Additional Witnesses [*See KCLCR 26(k)*]. | 07/12/2021 |
|   | **DEADLINE** for Jury Demand [*See KCLCR 38(b)(2)*]. | 07/26/2021 |
|   | **DEADLINE** for a Change in Trial Date [*See KCLCR 40(e)(2)*]. | 07/26/2021 |
|   | **DEADLINE** for Discovery Cutoff [*See KCLCR 37(g)*]. | 09/13/2021 |
|   | **DEADLINE** for Engaging in Alternative Dispute Resolution [*See KCLCR 16(b)*]. | 10/04/2021 |
|   | **DEADLINE**: Exchange Witness & Exhibit Lists & Documentary Exhibits [*KCLCR 4(j)*]. | 10/11/2021 |
| * | **DEADLINE** to file Joint Confirmation of Trial Readiness [*See KCLCR 16(a)(1)*] | 10/11/2021 |
|   | **DEADLINE** for Hearing Dispositive Pretrial Motions [*See KCLCR 56; CR 56*]. | 10/18/2021 |
| * | Joint Statement of Evidence [*See KCLCR 4 (k)*] | 10/25/2021 |
|   | **DEADLINE** for filing Trial Briefs, Proposed Findings of Fact and Conclusions of Law and Jury Instructions (Do not file proposed Findings of Fact and Conclusions of Law with the Clerk) | 10/25/2021 |
|   | Trial Date [*See KCLCR 40*]. | 11/01/2021 |

The * indicates a document that must be filed with the Superior Court Clerk's Office by the date shown.

## III. ORDER

Pursuant to King County Local Rule 4 [*KCLCR 4*], IT IS ORDERED that the parties shall comply with the schedule listed above.  Penalties, including but not limited to sanctions set forth in Local Rule 4(g) and Rule 37 of the Superior Court Civil Rules, may be imposed for non-compliance.  It is FURTHER ORDERED that the party filing this action **must** serve this *Order Setting Civil Case Schedule* and attachment on all other parties.


DATED:     11/03/2020


_____
PRESIDING JUDGE

# IV. ORDER ON CIVIL PROCEEDINGS FOR ASSIGNMENT TO JUDGE

**READ THIS ORDER BEFORE CONTACTING YOUR ASSIGNED JUDGE.**
This case is assigned to the Superior Court Judge whose name appears in the caption of this case schedule.  The assigned Superior Court Judge will preside over and manage this case for all pretrial matters.

**COMPLEX LITIGATION:**  If you anticipate an unusually complex or lengthy trial, please notify the assigned court as soon as possible.

**APPLICABLE RULES:**  Except as specifically modified below, all the provisions of King County Local Civil Rules 4 through 26 shall apply to the processing of civil cases before Superior Court Judges.  The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**CASE SCHEDULE AND REQUIREMENTS:**  Deadlines are set by the case schedule, issued pursuant to Local Civil Rule 4.

**THE PARTIES ARE RESPONSIBLE FOR KNOWING AND COMPLYING WITH ALL DEADLINES IMPOSED BY THE COURT'S LOCAL CIVIL RULES.**

## A. Joint Confirmation regarding Trial Readiness Report
No later than twenty one (21) days before the trial date, parties shall complete and file (with a copy to the assigned judge) a joint confirmation report setting forth whether a jury demand has been filed, the expected duration of the trial, whether a settlement conference has been held, and special problems and needs (e.g., interpreters, equipment).

The Joint Confirmation Regarding Trial Readiness form is available at www.kingcounty.gov/courts/scforms. If parties wish to request a CR 16 conference, they must contact the assigned court.  Plaintiff's/petitioner's counsel is responsible for contacting the other parties regarding the report.

## B. Settlement/Mediation/ADR
a. Forty five (45) days before the trial date, counsel for plaintiff/petitioner shall submit a written settlement demand.  Ten (10) days after receiving plaintiff's/petitioner's written demand, counsel for defendant/respondent shall respond (with a counter offer, if appropriate).

b. Twenty eight (28) days before the trial date, a Settlement/Mediation/ADR conference shall have been held.  FAILURE TO COMPLY WITH THIS SETTLEMENT CONFERENCE REQUIREMENT MAY RESULT IN SANCTIONS.

## C. Trial
Trial is scheduled for 9:00 a.m. on the date on the case schedule or as soon thereafter as convened by the court.  The Friday before trial, the parties should access the court's civil standby calendar on the King County Superior Court website www.kingcounty.gov/courts/superiorcourt to confirm the trial judge assignment.

# MOTIONS PROCEDURES

## A. Noting of Motions

**Dispositive Motions:**  All summary judgment or other dispositive motions will be heard with oral argument before the assigned judge.  The moving party must arrange with the hearing judge a date and time for the hearing, consistent with the court rules.  Local Civil Rule 7 and Local Civil Rule 56 govern procedures for summary judgment or other motions that dispose of the case in whole or in part.  The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**Non-dispositive Motions:**  These motions, which include discovery motions, will be ruled on by the assigned judge without oral argument, unless otherwise ordered.  All such motions must be noted for a date by which the ruling is requested; this date must likewise conform to the applicable notice requirements. Rather than noting a time of day, the Note for Motion should state "Without Oral Argument."  Local Civil Rule

7 governs these motions, which include discovery motions.  The local civil rules can be found at www.kingcounty.gov/courts/clerk/rules/Civil.

**Motions in Family Law Cases not involving children:** Discovery motions to compel, motions in limine, motions relating to trial dates and motions to vacate judgments/dismissals shall be brought before the assigned judge.  All other motions should be noted and heard on the Family Law Motions calendar.  Local Civil Rule 7 and King County Family Law Local Rules govern these procedures.  The local rules can be found at www.kingcounty.gov/courts/clerk/rules.

**Emergency Motions:**   Under the court's local civil rules, emergency motions will usually be allowed only upon entry of an Order Shortening Time.  However, some emergency motions may be brought in the Ex Parte and Probate Department as expressly authorized by local rule.  In addition,  discovery disputes may be addressed by telephone call and without written motion, if the judge approves in advance.

**B.  Original Documents/Working Copies/ Filing of Documents:  All original documents must be filed with the Clerk's Office.**  Please see information on the Clerk's Office website at www.kingcounty.gov/courts/clerk regarding the requirement outlined in LGR 30 that attorneys must e-file documents in King County Superior Court.  The exceptions to the e-filing requirement are also available on the Clerk's Office website. The local rules can be found at www.kingcounty.gov/courts/clerk/rules.

The working copies of all documents in support or opposition must be marked on the upper right corner of the first page with the date of consideration or hearing and the name of the assigned judge.  The assigned judge's working copies must be delivered to his/her courtroom or the Judges' mailroom.  Working copies of motions to be heard on the Family Law Motions Calendar should be filed with the Family Law Motions Coordinator.  Working copies can be submitted through the Clerk's office E-Filing application at www.kingcounty.gov/courts/clerk/documents/eWC.

**Service of documents:** Pursuant to Local General Rule 30(b)(4)(B), e-filed documents shall be electronically served through the e-Service feature within the Clerk's eFiling application.  Pre-registration to accept e-service is required.  E-Service generates a record of service document that can be e-filed.  Please see the Clerk's office website at www.kingcounty.gov/courts/clerk/documents/efiling regarding E-Service.

**Original Proposed Order:** Each of the parties must include an original proposed order granting requested relief with the working copy materials submitted on any motion.  **Do not file the original of the proposed order with the Clerk of the Court**.   Should any party desire a copy of the order as signed and filed by the judge, a pre-addressed, stamped envelope shall accompany the proposed order.  The court may distribute orders electronically.  Review the judge's website for information: www.kingcounty.gov/courts/SuperiorCourt/judges.

**Presentation of Orders for Signature:** All orders must be presented to the assigned judge or to the Ex Parte and Probate Department, in accordance with Local Civil Rules 40 and 40.1. Such orders, if presented to the Ex Parte and Probate Department, shall be submitted through the E-Filing/Ex Parte via the Clerk application by the attorney(s) of record. E-filing is not required for self-represented parties (non-attorneys). If the assigned judge is absent, contact the assigned court for further instructions.  If another judge enters an order on the case, counsel is responsible for providing the assigned judge with a copy.

**Proposed orders finalizing settlement and/or dismissal by agreement of all parties shall be presented to the  Ex Parte and Probate Department.**  Such orders shall be submitted through the E-Filing/Ex Parte via the Clerk application by the attorney(s) of record. E-filing is not required for self-represented parties (non-attorneys). Formal proof in Family Law cases must be scheduled before the assigned judge by contacting the bailiff, or formal proof may be entered in the Ex Parte Department.  **If final order and/or formal proof are entered in the Ex Parte and Probate Department, counsel is responsible for providing the assigned judge with a copy.**

**C. Form**
Pursuant to Local Civil Rule 7(b)(5)(B), the initial motion and opposing memorandum shall not exceed 4,200 words and reply memoranda shall not exceed 1,750 words without authorization of the court. The word count

includes all portions of the document, including headings and footnotes, except 1) the caption; 2) table of contents and/or authorities, if any; and 3): the signature block. Over-length memoranda/briefs and motions supported by such memoranda/briefs may be stricken.

***IT IS SO ORDERED.  FAILURE TO COMPLY WITH THE PROVISIONS OF THIS ORDER MAY RESULT IN DISMISSAL OR OTHER SANCTIONS.  PLAINTIFF/PEITITONER SHALL FORWARD A COPY OF THIS ORDER AS SOON AS PRACTICABLE TO ANY PARTY WHO HAS NOT RECEIVED THIS ORDER.***

_____
PRESIDING JUDGE



# ECR Online · SUPERIOR COURT CLERK'S OFFICE

## All Documents

| All Documents | Viewable |
|---|---|

**Case Number:** 20-2-16194-2  **Case Title:** KEAN VS SEATTLE CHILDRENS HOSPITAL DBA  **Filter By:** - All -

### My Account Info
Pages Remaining: 93
Buy More
Pages Selected: 0
Reports Selected: 0
Amount Remaining: 23.25
Amount Purchased: 25.00

### INSTRUCTIONS
▶ 1) Select the documents you wish to purchase by checking the box to the left of the Sub #. 2) Click on the Get Document button.

| Select | Sub #▲ | Pages | Date | Description |
|---|---|---|---|---|
| ☐ | 1 | 18 | 11/03/2020 | Commercial Complaint |
| ☐ | 2 | 6 | 11/03/2020 | Order Setting Case Schedule - Civil |
| ☐ | 3 | 1 | 11/03/2020 | Case Information Cover Sheet |

**Get Document(s)**

King County | News | Services | Comments | Search

Links to external sites do not constitute endorsements by King County.
By visiting this and other King County web pages,
you expressly agree to be bound by terms and conditions of the site.
The details.

Build: Build 4.0.0.0 (PROD) Last Updated 7/22/2020